## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>THE WESTERN UNION COMPANY,<br>a corporation, also doing business as<br>Western Union Financial Services, Inc.,<br>and through other subsidiaries and affiliates,<br><br>Defendant. | Civil Action No. |

## COMPLAINT FOR PERMANENT INJUNCTIVE
## AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310,

1

in connection with Defendant's failure to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the

disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 6102(c), and 6105(b).

## **DEFENDANT**

6.      Defendant The Western Union Company ("Western Union"), also doing business as Western Union Financial Services, Inc., and through other subsidiaries and affiliates, is a Delaware corporation with its principal place of business at 12500 East Belford Avenue, Englewood, Colorado 80112.  Western Union transacts or has transacted business in this district, as well as throughout the United States and the world.

7.      Western Union operates, and enters into contracts for the provision of, money transfer services worldwide, through numerous subsidiaries and affiliates, including, but not limited to, Western Union Financial Services, Inc., Western Union Payment Services Ireland Limited ("WUPSIL"), Western Union Payment Services Network EU/EEA Limited, Western Union Financial Services (Canada) Inc., Western Union Network Ireland Ltd., Western Union Network Canada Company, Western Union Network France SAS, Western Union Network Belgium Sprl., Western Union Payment Services UK Ltd., Western Union International Bank GmbH, American Rapid Corporation, Grupo Dinamico Empresarial, S.A. de C.V., Servicio Integral de Envios, S.A. de C.V., and Operaciones Internacionales OV, S.A. DE C.V.

3

## COMMERCE

8.      At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## BACKGROUND

9.      For many years, Western Union's money transfer system has been used by fraudsters around the world to obtain money from their victims.  Discrete subsets of Western Union agents in various countries have largely been responsible for processing the payments, and many Western Union agents have played active and important roles in facilitating those frauds.  As described more fully below, although Western Union has long been aware and has received many warnings that its system is being used for frauds, for many years it has failed to implement adequate and effective policies and procedures to detect and prevent fraud and to take prompt action to effectively address problematic agent locations.  In some instances, Western Union's agent locations have been, or likely been, complicit in the frauds, and have engaged in suspicious activities indicative of complicity in paying out fraud-induced money transfers.  In other cases, Western Union's agent locations have facilitated the scams by paying out fraud-induced money transfers in violation of Western Union's anti-fraud and/or Anti-Money Laundering ("AML") policies and procedures that impact consumer fraud.  Western Union has

4

known about the problem and has identified many of the agents providing substantial assistance or support to the frauds.  Although as a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012, Western Union still has failed in many cases to promptly suspend and terminate agent locations facilitating fraud.  Instead, Western Union has continued to profit from the activities of these agents.

### Western Union's Money Transfer System

10.     Western Union offers money transfer services to consumers worldwide through a network of approximately 515,000 agent locations in more than 200 countries and territories.  Western Union is the largest money transfer company in the United States and worldwide.  More than 50,000 of its 515,000 agent locations are in the United States.  In addition to offering money transfer services under the Western Union brand, Western Union owns and operates Orlanda Valuta ("OV"), which provides money transfer services primarily to Mexico, and Vigo, which provides money transfer services primarily to Latin America and the Caribbean.  Consumers in the United States can send money transfers through OV and Vigo from thousands of Western Union agent locations.  According to Western Union, "[e]very day, millions of consumers rely on Western Union Money Transfer® service to send money to loved ones near and far."

11.     Consumers wishing to send funds using Western Union's money transfer system may initiate a transaction in person, online, or over the telephone. Western Union claims that its locations are "around every corner" with "knowledgeable agents," and that its money transfer services are "fast, convenient, and safe."  Although the amount that may be sent online or over the telephone is sometimes restricted, there typically are no restrictions on the amount of money that a consumer can send in person from agent locations.  Certain countries, however, limit the amount of money that can be picked up from agent locations. For in-person money transfers, consumers must pay with cash or a bank-issued debit card.  For online or telephone transfers, consumers typically must pay with a credit or debit card.  Over 90% of money transfers sent through Western Union are initiated in person at Western Union's agent locations.

12.     When initiating a money transfer at one of Western Union's agent locations, the sender must complete a "send form," which typically requires the sender's name, address and telephone number, and the name of the recipient and the city, state/province, and country to which the money transfer is being sent. Consumers initiating money transfers at Western Union's agent locations may select from Western Union's "Money in Minutes" or "Next Day" services, where available.  For money transfers above a certain amount, such as $1,000, the sender must present identification ("ID") and the agent locations must record in Western

Union's system the sender's ID information.  Over time, in some countries,

Western Union has lowered the amount that triggers the ID requirement.

13.     In order to send a money transfer, consumers must pay a fee to

Western Union.  This fee varies depending upon the method of the money transfer,

the destination, the amount, the method of payment, and how quickly the money

transfer is to be completed.  The money transfer fee for Western Union's "Money

in Minutes" service is higher than its "Next Day" service.  According to Western

Union's website, to send a $1,000 "Money in Minutes" money transfer from the

United States to the United Kingdom ("UK"), consumers must pay an $81 transfer

fee if paying by credit or debit card, or $58 if paying in cash.  For international

money transfers, in addition to charging consumers a money transfer fee, Western

Union also makes money from the foreign currency exchange.  Upon initiating a

money transfer, consumers are provided with a unique tracking number called a

Money Transfer Control Number ("MTCN").

14.     Prior to paying out funds at its agent locations, Western Union's

practice is generally to require the recipient to provide the MTCN, to complete a

"receive form" with the recipient's name, address and telephone number, and to

present ID.  For many years, for money transfers of less than $1,000, even though

recipients may have been required to present ID, Western Union agent locations

worldwide have not been required to record in Western Union's system the

recipient's ID information.  When the recipient does not have an ID and the money transfer is less than $1,000, the sender sometimes has the option of using a "Test Question and Answer."  According to Western Union, this option "is designed for emergency situations where the receiver doesn't have proper identification" because his or her wallet was stolen.

15.    Regardless of the method used to initiate the money transfer, all Western Union money transfers flow through the same global money transfer system controlled by Western Union.  This system coordinates and makes funds available to complete the transactions.  Agents must have active accounts with Western Union to send and receive money transfers using Western Union's money transfer system.

16.    Once Western Union's agent locations have paid out the funds, Western Union's policy typically is that the sender cannot obtain a refund from Western Union of either the amount transferred or the money transfer fee, even if the sender was a victim of fraud or the money transfer was paid out to someone other than the intended recipient.  The policy even applies if the Western Union agent location was complicit in the fraud, engaged in suspicious activity, or failed to follow Western Union's policies and procedures when processing the money transfer (*e.g.*, by failing to record the recipient's ID or other required information).

### Use of Western Union's Money Transfer
### System to Facilitate Fraud and Harm Consumers

17.     Over the years, money transfers have increasingly become the

payment method of choice for scams that prey on consumers around the world.

Fraudulent telemarketers and con artists prefer to use money transfers to facilitate

their scams because, among other reasons, they can pick up money transferred

within minutes at multiple locations and, oftentimes, the perpetrators are afforded

anonymity because the payments are untraceable.  For example, money transfers

can be picked up at any location within a particular state or country; some money

transfers can be picked up without presenting or having to record an ID; fake

names, addresses, and IDs sometimes can be used; and Western Union's own agent

locations sometimes fail to follow the company's policies and procedures in paying

out money transfers, and in other instances, are complicit in the frauds.  Therefore,

it is often difficult for consumers and law enforcement to identify and locate the

recipients of fraud-induced money transfers.

18.     Western Union maintains a database of complaints it receives about

fraud-induced money transfers.  Based on information in that database, between

January 1, 2004 and August 29, 2015, Western Union received at least 550,928

complaints about fraud-induced money transfers, totaling at least $632,721,044.

Over 80% of the complaints in the database were from U.S. consumers.  The

average individual consumer fraud loss reflected in that database was

approximately $1,148.  That is more than three times the amount of Western

Union's average money transfer for the years 2010 through 2014—approximately

$346—and more than seven times the amount of Western Union's median money

transfer for the same period—approximately $162.

19.     As explained more fully below, the complaints in Western Union's

database represent only a small percentage of the actual fraud perpetrated through

Western Union's money transfer system because most victimized consumers do

not complain directly to Western Union.  In addition, Western Union also does not

include information in its database about all of the complaints it receives.

Therefore, since at least January 1, 2004, it is likely that Western Union's money

transfer system has been used to send billions of dollars in fraud-induced payments

to telemarketers and con artists worldwide.

## Western Union's Contractual Authority
## to Oversee and Take Action Against its Agents

20.     Western Union requires that its agents, which are also referred to as

authorized delegates or representatives, sign written agreements in order to offer

and provide payment services through Western Union's money transfer system.

The initial terms of the written agreements typically are five years, after which

they are renewable for additional periods of time.  Western Union pays its agents

in the United States an agreed-upon commission, performance bonus, and volume

bonus for offering and processing money transfer services on Western Union's

behalf, while it pays its international agents an agreed-upon base compensation for the consumer fee received, and a percentage of the foreign exchange profits, on each transaction.

21.     Western Union's written agreements with its agents typically require the agents to comply with all applicable laws, including laws for detecting and preventing money laundering.  These agreements also provide that Western Union has the right to immediately suspend or terminate its agents, including any agent location.  Western Union's agents are required to keep records for all transactions, provide them to Western Union upon request, and cooperate with any audit or review by Western Union.  The agreements also provide Western Union with the right to inspect and audit its agents' books and records to monitor the agents' compliance with the agreement, applicable law, and Western Union's policies.

22.     Western Union's agents, which are also sometimes referred to as "network agents," "master agents," or "super-agents," in many instances provide Western Union's money transfer services through their own networks or locations, or, in countries outside of the United States and Canada, also through sub-representatives, which Western Union commonly refers to as "subagents" (hereinafter collectively referred to as "agents" or "subagents").  Western Union typically is not involved in enrolling its agents' subagents and does not have a direct contractual relationship with them.  Western Union's agreements with its

11

agents, however, provide it with the authority to suspend and terminate its agents' subagents, as well as any location at which its money transfer services are offered.

## Western Union's Programs, Policies, and Procedures

23.     Western Union has two primary programs relating to the detection and prevention of consumer fraud and the installation and oversight of agents: its anti-fraud program, which sometimes is referred to as its consumer protection program, and its AML program.  As implemented by Western Union, for many years these interrelated programs failed to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system.  Western Union's design and implementation of these programs for addressing fraud, as well as its oversight of its global money transfer system, occur primarily within the United States.

24.     For many years, Western Union has failed to implement a comprehensive and effective anti-fraud program.  In or around April 2003, after Western Union became aware that some of its agents had been suspected of being involved in paying out fraud-induced money transfers to telemarketers, Western Union's Security Department developed a Standard Operating Procedure ("SOP") for reviewing and suspending agents for consumer fraud.  The SOP outlines a process and guidelines for identifying agents for review and suspension based on consumer fraud complaints, as well as a process for reinstating or terminating

agents.  The SOP was revised at various times, most recently in or around

September 2010.  Beginning in or around January 2006, the SOP included

procedures that applied to agents outside of the United States and Canada.

However, to the extent that Western Union suspended and/or terminated agents

pursuant to the SOP, for many years the suspensions and/or terminations were

typically limited to agents in the United States and Canada.

25.     In a written report in January 2011, Western Union represented it was

making "enhancements" to its consumer protection program that were to include

improvements to the company's program for conducting due diligence and training

of its agents, monitoring agent activity, and taking disciplinary action, including

suspension and termination, against agents.  Subsequently, in a written report about

its anti-fraud program dated September 14, 2012, Western Union claimed it had

implemented "a comprehensive anti-fraud program" that included agent training,

agent monitoring, and "[p]rompt action, including suspensions and terminations,

against Agents when the Company identifies fraudulent activity."  Western Union

recognized in this report that its "first line of defense against fraud is to engage

Agents who will fully comply with the Anti-Fraud program and policies and

procedures."

26.     As a result of the FTC's investigation, Western Union has made

progress since 2012 in identifying and blocking potentially fraudulent transactions

and in otherwise protecting consumers from fraud.  Despite that, Western Union continued to fail, in certain cases, to promptly suspend and terminate certain high-fraud agent locations, including locations that appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures.

27.     In addition to its anti-fraud program, Western Union is required by the Bank Secrecy Act ("BSA") to have an effective AML program to guard against money laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud.  As part of its AML program, Western Union has developed Know Your Agent guidelines and policies, and policies and procedures for monitoring transaction, customer, and agent activity for risks, including suspicious activity and agent complicity.  Western Union's AML program relies heavily upon its agents to have their own AML programs.  In many cases, Western Union or its agents have failed to implement effective AML policies and procedures pertaining to consumer fraud, thereby making Western Union's money transfer system more vulnerable to consumer fraud.

28.     As described below, Western Union has failed to: promptly investigate, suspend, and terminate potentially complicit agents and subagents, or agents and subagents that have failed to comply with Western Union's anti-fraud and/or AML policies and procedures that impact consumer fraud; conduct

adequate due diligence on prospective and existing agents and subagents;

effectively train, monitor, and review agents, subagents, and front line associates,

who are responsible at the point of sale for processing money transfers at Western

Union's agent locations ("FLAs"), with respect to consumer fraud; adequately

collect, record, and report consumer fraud involving its money transfer system; and

adopt other reasonable measures to prevent fraud-induced money transfers.  In

some cases Western Union has failed to adopt adequate and effective policies and

procedures to detect and prevent fraud-induced money transfers, while in other

cases it has failed to adhere to its own anti-fraud and AML programs, policies, and

procedures.

## WESTERN UNION'S MONEY TRANSFER SYSTEM HAS REGULARLY BEEN USED FOR FRAUD

29.    Perpetrators of many different types of mass marketing and imposter

scams have relied on money transfer systems, including Western Union's system,

as a means of fraudulently obtaining money from consumers around the world.  All

of these scams operate deceptively in violation of Section 5 of the FTC Act, and

many of the scams also involve fraudulent telemarketing in violation of the TSR.

30.    In these scams, consumers often are instructed over the telephone or

by email to send money transfers through Western Union's money transfer system.

The telemarketers and con artists use false or misleading statements to induce

consumers either to pay for purported goods or services, or to make payments as a

result of purported circumstances, such as emergencies, that do not exist.

Consumers' fraud-induced payments through Western Union's system often

exceed $1,000 per transaction.  The types of scams referenced in Western Union's

own complaint database include, but are not limited to:

    a.    *Online or Internet purchases* (*see* FTC Consumer Alert on

Online purchases, available at http://www.ftc.gov/news-events/press-

releases/2006/07/ftc-advises-consumers-not-use-wire-transfers-online-

purchases): According to Western Union's complaint database,

between January 1, 2004 and August 29, 2015, the company received

at least 146,909 complaints about this type of scam totaling at least

$187,877,003 in losses;

    b.    *Lottery or prize scams* (*see*

http://www.consumer.ftc.gov/articles/0086-international-lottery-

scams): According to Western Union's complaint database, between

January 1, 2004 and August 29, 2015, the company received at least

75,543 complaints about this type of scam totaling at least

$86,138,055 in losses;

    c.    *Emergency scams, including grandparent scams* (*see*

http://www.consumer.ftc.gov/articles/0204-family-emergency-scams):

According to Western Union's complaint database, between January

1, 2004 and August 29, 2015, the company received at least 41,897 complaints about this type of scam totaling at least $73,807,353 in losses;

d. *Advance-fee loan scams* (*see* http://www.consumer.ftc.gov/articles/0078-advance-fee-loans): According to Western Union's complaint database, between January 1, 2004 and August 29, 2015, the company received at least 71,296 complaints about this type of scam totaling at least $43,617,107 in losses; and

e. *Online dating or romance scams* (*see* http://www.ftc.gov/news-events/press-releases/2010/11/ftc-warns-consumers-about-online-dating-scams): According to Western Union's complaint database, between January 1, 2004 and August 29, 2015, the company received at least 44,588 complaints about this type of scam totaling at least $40,980,482 in losses.

31. When consumers send the money transfers from one of Western Union's agent locations, the perpetrators of the scams described above, or those acting on their behalf, frequently collect the funds from one of Western Union's corrupt or complicit agent locations or from agent locations that violate Western Union's anti-fraud and/or AML policies and procedures, such as by failing to

properly collect and record all of recipients' IDs or biological information, or by recording obviously false information.

## A DISCRETE SUBSET OF WESTERN UNION AGENTS WORLDWIDE HAS PAID OUT THE MAJORITY OF FRAUD-INDUCED MONEY TRANSFERS

32.     Western Union's records show that the majority of fraud-induced money transfers have been paid out by a discrete, and easily identifiable, subset of Western Union's agents and subagents in various countries around the world.  The vast majority of Western Union agent locations worldwide do not pay out transactions associated with a single fraud complaint to Western Union.  In fact, only a small and discrete subset of agents and subagents worldwide pay out money transfers relating to any fraud complaints.  An even more easily identifiable and distinct subset of agents and subagents have been the subject of five or more fraud complaints in a given year, but this group of Western Union agents has been responsible for paying out most of the reported fraud losses.  For example:

a.     In 2012, 137 agent locations in Mexico (out of an average of 17,710 locations operating in that country each month of the year) had five or more fraud complaints, and these 137 agents were responsible for paying out approximately $3.2 million, amounting to over 80% of the total reported fraud for Mexico that year.  Similarly, in 2013, 140 agent locations in Mexico (out of an average of 9,002 locations) paid

out approximately $2.1 million, amounting to over 75% of the total reported fraud in Mexico, and in 2014, 108 agent locations (out of an average of 8,345 locations) paid out approximately $1.5 million, amounting to over 76% of the total reported fraud.

     b.     In 2012, 188 agent locations in Nigeria (out of an average of 5,036 locations in that country) had five or more fraud complaints, and these 188 agents paid out approximately $1.9 million, amounting to over 77% of the total reported fraud for Nigeria that year.  In 2013, 235 agent locations in Nigeria (out of an average of 5,034 locations) paid out approximately $1.5 million, amounting to over 71% of the total reported fraud in Nigeria, and in 2014, 269 agent locations (out of an average of 5,208 locations) paid out approximately $2.6 million, amounting to over 84% of the total reported fraud.

33.    Western Union's internal reports and memoranda show that the company was aware that discrete and easily identifiable subsets of agents and subagents in various locations were responsible for paying out the majority of fraud-induced money transfers.  For example, a Financial Intelligence Report titled "G.A.P. – United Kingdom" stated that a review of fraud complaints in late 2009 revealed that one network of agents "accounted for more consumer Fraud Complaints than any other Agent Network in the United Kingdom" and that an

analysis of data in the first quarter of 2010 for nineteen agents demonstrated "indicators of Agent complicity." A January 19, 2012 memorandum regarding "GMI Fraud Monitoring and Intelligence" stated that in Spain "when looking at a list of 30 Agents that were investigated in 2010 it was determined that the amount of potential fraud identified by GMI surpassed the *total number of formal fraud complaints and amounts for the entire country in 2010*, demonstrating the true levels of fraud related risk present in Spain." (Emphasis in original.) In March 2012, a senior compliance analyst found that from December 1, 2011 to February 24, 2012, "nearly 85% of all emergency fund fraud complaints filed with Western Union" involved money transfers paid out by one master agent in Mexico, Elektra, through 94 of its locations.

## MANY WESTERN UNION AGENTS HAVE BEEN ACTIVE OR COMPLICIT IN THE UNDERLYING SCAMS

34.     Many Western Union agent locations that have received fraud-induced money transfers from consumers and paid out such transfers to the fraudulent telemarketers and con artists have been complicit in the underlying scams. In some cases, the sellers, telemarketers, or imposters who have operated the scams have been Western Union's own agents or subagents.

35.     At least 146 of Western Union's agents and subagents around the world, as well as at least two FLAs, have been charged with acting collusively in the frauds employing Western Union's money transfer system. Of the 146 agents,

20

39 agents in the United States and Canada have been charged in the United States with defrauding consumers through various mass marketing and/or telemarketing schemes including fraudulent sweepstakes, advance fee loans, business opportunities (including secret shopper or work-at-home scams), emergency or person-in-need schemes, and/or Internet purchase offers.  The charges against these 39 agents have included conspiracy to commit mail fraud, wire fraud and/or money laundering, and most of the agents have already pleaded guilty or been convicted of the charges.  These 39 agents paid out over $5.2 million in money transfers that were reported to Western Union as having been induced by fraud.  As explained below, however, actual consumer losses far exceed the reported losses. These matters include:

| Case | Western Union Agents |
|---|---|
| *United States v. Agbasi, et al.*, No. 07-CR-504 (M.D. Pa.) | Stanley Akubueze and Christopher Ozurus (d/b/a Afro Spot Restaurant) <br> Philip Utomi (d/b/a Swift Cash Centre) |
| *United States v. Bellini, et al.*, No. 07-CR-1402 (C.D. Cal.) | Vijayakumar Ramakrishnan (d/b/a Cafe Chambly) <br> John Felix Alexander (d/b/a Imudia Int) |
| *United States v. Ayodele, et al.*, No. 10-CR-058 (M.D. Pa.) | Soji Ayodele  (d/b/a Total Communications Centre) <br> Mohsen Golab (d/b/a Golden Century) <br> Christian Kevin (d/b/a C K Business Service) |
| *United States v. Akinola, et al.*, No. 10-CR-300 (S.D. Tex.) | Jonathan Akinola (d/b/a Postal & Wireless Outlet) |
| *United States v. Groysman*, No. 10-CR-326 (M.D. Pa.) | Bella Groysman (d/b/a Professional Medical Supplies) |

| | |
|---|---|
| *United States v. Dobrovinsky-Kaz*, No. 10-CR-327 (M.D. Pa.) | Tatyana Dobrovinsky-Kaz (d/b/a Professional Medical Supplies) |
| *United States v. Abbey*, No. 10-CR-344 (M.D. Pa.) | Festus G. Abbey (d/b/a Abbey's One Stop and Abbey Multi Service) |
| *United States v. Nwuda*, No. 10-CR-508 (C.D. Cal.) | Nmandi Nick Nwuda (d/b/a CKane Check Cashing & Postal) |
| *United States v. Idemudia*, No. 11-CR-001 (M.D. Pa.) | Eugene Idemudia (d/b/a IV Beauty Supply and RM & E) |
| *United States v. Agho, et al.*, No. 11-CR-113 (M.D. Pa.) | Betty Agho (d/b/a Star Multiservice) Itohan Agho-Allen (d/b/a Miracle Multi Link) Prince Edosa (d/b/a Gosa Multi Services and A & M Communications) Kennedy Onaiwu (d/b/a Kenizo Enterprise) Ikejiani Okoloubu (d/b/a First Cone and Depanneur Ice) Susan Osagiede (d/b/a A & M Communications) Elvis Uadiele (d/b/a Diale Investment) Nekpen Omorodion (d/b/a Global Multiservices) |
| *United States v. Adigun, et al.*, No. 11-CR-151 (M.D. Pa.) | Olufemi Adigun (d/b/a FAB) |
| *United States v. Louissaint*, No. 11-CR-201 (M.D. Pa.) | Emmanuel Louissaint (d/b/a Hudson Food Market II) |
| *United States v. Brown*, No. 12-CR-001 (M.D. Pa.) | Blessing Brown (d/b/a O & B Enterprise Inc) |
| *United States v. Mayele*, No. 12-CR-210 (C.D. Cal.) | Prince Martin Mayele (d/b/a Du Monde Digital Trades) |
| *United States v. Mgbolu, et al.*, No. 12-CR-232 (M.D. Pa.) | Alex Mgbolu (d/b/a FA CAM Assoc. & Financial Corp) Chima Nneji (d/b/a Advanced Computer Service and Hallmark Business Services) William Nneji (d/b/a Hallmark Business Services) |

| *United States v. Idisi-Arah*, et al., No. 12-CR-311 (M.D. Pa.) | Lucas Obi (d/b/a Canada Cash Express) |
| --- | --- |
| *United States v. Anyika*, et al., No. 14-CR-006 (M.D. Pa.) | Ejike Egwuekwe (d/b/a Merrick Multiple Services and Lincoln One Stop Place) Franklyn Idehen (d/b/a Treasure Links and Cherrish Communication Center) Nnamdi Ihezuo (d/b/a Net Global & Multi Services) Cyprian Osita Ngbadi (d/b/a Rockaway Business Center) |
| *State of Texas v. Mbaka*, No. 09-DCR-52310A (Tex. Dist. Ct. Ft. Bend County) | Boniface Ifeanyi Mbaka (d/b/a BIM Services) |

36.     Criminal law enforcers in other countries also have taken action against at least an additional 107 Western Union agents and two FLAs, including in the following instances:

a.     Sentencing in the UK (in or around November 2012) of an individual, Peter Oyewor, who operated at least two Western Union agent locations (d/b/a Benson Logistics and Abmec Logistic) and was found guilty of money laundering over £1.34 million in proceeds from consumer frauds;

b.     Arrests made by the Nigerian Special Fraud Unit (in or around June 2013) of two FLAs at a Western Union location (Skye Bank PLC) for aiding Internet fraudsters; and

c.     Arrests made by the Spanish police (in or around July 2014) of 105 Western Union agents in Spain, who were involved in a massive

international scam involving Nigerian frauds that primarily targeted

U.S., Canadian, and German consumers, and caused at least €11.5

million (approximately $15.5 million) in consumer injury.

## WESTERN UNION HAS BEEN AWARE THAT ITS SYSTEM HAS BEEN USED FOR FRAUD-INDUCED MONEY TRANSFERS

37.    Since at least January 2004, Western Union has been aware that its

system has regularly been used for fraud and that it has an identifiable subset of

agents and subagents with high levels of fraud complaints.  It also has been aware

that many of its agent locations with high-fraud payouts have: (1) violated Western

Union's anti-fraud and/or AML policies and procedures; (2) engaged in suspicious

activities; and/or (3) been complicit, or likely complicit, in the frauds.  Western

Union's awareness of the consumer fraud problem is demonstrated by, among

other things, the hundreds of thousands of complaints it has received from

consumers, its own internal records and reports, and years of warnings from

government agencies throughout the world.

### Defrauded Consumers Have Regularly Complained to Western Union

38.    When consumers realize that they have been defrauded, they

sometimes contact Western Union to report the fraud, often using a toll-free

number made available by Western Union to consumers in certain countries,

including the United States.  In some cases, consumers also have filed lawsuits

against Western Union due to the company's role in processing the fraud-induced

money transfers.  In addition, as described above, between approximately January 1, 2004 and August 29, 2015, Western Union's database shows at least 550,928 complaints it received about at least $632,721,044 in fraud-induced money transfers.  Western Union also has other records reflecting additional complaints it received, which were not recorded in the database, including a spreadsheet of at least 8,497 complaints Western Union received in 2005 regarding fraud-induced money transfers, which totaled at least $14,478,365.

39.     The complaints reported to Western Union, however, represent only a fraction of the consumer frauds employing Western Union's money transfer system for at least three reasons:

a.     For years, Western Union has failed to provide victims in many countries worldwide with access to a fraud hotline, or a toll-free telephone number for victims to call to report fraud, which is the most convenient mechanism for many victims to promptly report fraud;

b.     The majority of consumer victims do not complain directly to Western Union.  Western Union's own internal reports recognize that only a small percentage of consumers complain about fraud and that the volume of fraud-induced money transfers is much higher than that reported to the company.  For example, Western Union has recognized in several reports that the actual amount of fraud-induced

money transfers associated with agent locations was in some cases over five times higher than the reported complaint figures; and

c.     As further explained below, Western Union's database of fraud complaints is incomplete because Western Union has failed to log in its database all of the complaints and reports about fraud it has received, as well as all of the fraud-induced money transfers related to the complaints.

**Western Union's Internal Reports and Records Demonstrate Awareness of Consumer Fraud by Agents in Various Countries Worldwide**

40.     Since at least 2005, Western Union has conducted reviews and investigations, and generated indices and reports, related to consumer fraud involving its money transfer system.  Information contained in Western Union's internal reports, communications, and other records demonstrates that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns.  These records demonstrate serious problems and suspicious activities by particular Western Union agents and subagents, including, but not limited to: (a) high numbers and patterns of complaints; (b) spikes in the number of money transfers received; (c) money transfer amounts that far exceed the average transfer amount; (d) data integrity issues (issues relating to the recording of ID numbers, dates of birth, or other information about recipients); (e) payouts within minutes after the money

26

transfers were sent; (f) flipping (shortly after receiving funds, a large portion of the money is sent to another recipient); (g) surfing (suspicious look-ups of money transfers in Western Union's system by FLAs); and (h) substantial sends to high-risk countries known for fraud.

41.     According to information contained in Western Union's complaint database, the United States has been the top country for fraud payouts since at least 2004 and has generated over three times the number of complaints as the next highest country.  In fact, over $128.2 million in reported fraud has been paid out in the United States since 2010, and Western Union has received more than 34,000 fraud complaints about transactions totaling over $21.2 million since 2014. Certain agent locations in the United States have operated for years despite high levels of fraud.  For example, between July 2008 and March 2015, one agent location in Washington, D.C. generated at least 116 fraud complaints totaling $187,356.  Even though reviews of the agent in June 2014 and February 2015 identified confirmed and potential fraud amounting to 84% and 55% of the money transfers paid at that location, the agent was not terminated until August 2015, after it failed an undercover test visit by a compliance officer tasked with assessing the agent's AML compliance.  Another agent location in Detroit, Michigan, paid out at least 194 money transfers totaling $379,031 in reported fraud since 2004.

Although this agent has received Western Union's fraud prevention training multiple times, it has continued to receive fraud complaints.

42.     Over the years, many other countries in addition to the United States have emerged as high-risk countries for fraud as international scams have become more pervasive.  For example, from 2006 to 2012, the UK was the second highest-payout country for fraud-induced money transfers behind the United States.  During that time, Western Union's UK agents paid out over $82.4 million in reported fraud, and internal reports and records demonstrate that Western Union was aware of problems with particular agents in the UK.  From January 1, 2004 to August 29, 2015, 172 UK agents paid out over $44.3 million in reported fraud.  A subset of only 34 of these agents was responsible for paying out nearly half of the reported fraud (at least $21.2 million), most of which came from U.S. victims.  The actual fraud paid out by these agents was likely much higher.  Total payouts by these agents during the period they were receiving fraud complaints amounted to $389 million, with $154 million of that coming from U.S. senders.  Notably, these agents also sent $104.6 million to Nigeria and $76.6 million to Romania, both of which are high-risk countries for fraud, as acknowledged by Western Union itself.  One agent alone, News Mark, was the top fraud agent in the UK and worldwide.  Between January 1, 2006 and January 14, 2013, Western Union received at least 1,421 fraud complaints about News Mark totaling at least $2,150,892, of which

over 84%, or $1,815,582, involved U.S. victims.  Although Western Union

identified News Mark as a high-fraud agent in the company's 60-day reports at

least 45 times between 2005 and 2010, and reviewed it for fraud and other

suspicious activities at least fifteen times between 2009 and 2012, Western Union

suspended and reactivated News Mark at least three different times before finally

terminating it in 2014.

43.     By 2007, Western Union was aware that Jamaica had become a

hotbed for fraud.  In that year alone, Western Union received at least 3,065

complaints from U.S. consumers about money transfers totaling $1,878,435 to

Jamaica.  Over the years, the top four fraud payout agents in Jamaica have

processed well over $1 million each in reported fraud, for a combined total of at

least $5,210,644.  According to internal Western Union reports, those agents also

have engaged in other highly suspicious activities, such as surfing.  One of those

agents, for example, surfed at least 985 transactions in a single month in 2010.

Even though all four of these agents have continued to receive many fraud

complaints for years, including hundreds in 2015, they continue to operate.  In fact,

Western Union has only terminated one agent in Jamaica for consumer fraud.  That

termination occurred on July 3, 2015, and the terminated agent had a much smaller

number of fraud complaints than others that Western Union has not terminated.

44.    In 2008, according to Western Union's records, Mexico was one of the top five countries worldwide for fraud payouts, with 1,393 complaints totaling over $1.8 million.  In 2009, Mexico was Western Union's sixth highest payout destination, with 1,626 complaints totaling over $2.1 million.  Since 2011, it has consistently been in the top three destination countries for reported fraud payouts from U.S. consumers, and the top payout destination for fraud related to emergency scams.  In 2011, Western Union received at least 2,824 emergency scam complaints on transfers paid out in Mexico.  The total amount paid out on these transfers was $6,908,666, and the average payout was $2,446.  Of those victims who reported their date of birth, nearly 70% were 65 years or older at the time they sent their money transfers.  Although Western Union has at least three master agents in Mexico, internal reports and records show that one master agent, Elektra, has been responsible for paying out most of the emergency scam complaints.  Of the reported emergency scam transfers paid out in Mexico between 2011 and 2014, Elektra agents were responsible for payouts relating to at least 7,107 complaints totaling $12,494,602, or 88% of the total reported losses.  During that same period, nineteen Elektra agents paid out $6,425,782 in reported emergency fraud, including one agent discussed further below that alone paid out over $1.4 million in reported fraud.  Nevertheless, and despite repeated reviews and investigations of agent locations in Mexico, as of October 2015, Western

Union had rarely, if ever, terminated agent locations in Mexico for consumer fraud, even in instances where particular agent locations repeatedly appeared on fraud reports, or had confirmed and potential fraud amounting to more than 25%, or even 50%, of their payouts.

45.     By 2010, internal reports and records show that Western Union was aware of a substantial increase in fraud complaints involving money transfers sent to Spain, and that particular agents there had very high levels of fraud and questionable activity.  From 2009 to 2010, the number of complaints paid out in Spain increased from 583 to 2,195, and the reported fraud amount rose from over $1.1 million to over $5.3 million.  Indeed, from 2010 to 2012, Spain was the third highest payout country by amount for complained-of transfers, trailing only the United States and the UK.  During that time, Western Union received at least 8,086 complaints about transfers paid out in Spain, totaling over $17 million.  From 2007 to 2012, a subset of 61 agents in Spain paid out over $11.9 million in reported fraud.  Western Union's internal reports and records document numerous instances of suspicious activity by these agents, including flipping and sending money transfers to high-risk countries.  The reported fraud paid out by agents in Spain, moreover, likely grossly understates the actual fraud.  For example, 20 agents in Spain that were responsible for over $5.7 million in reported fraud received more than $51.6 million during the period those agents were receiving fraud complaints,

of which over $22.7 million came from U.S. consumers.  During that time, those

20 agents were responsible for sending over $8.8 million to Nigeria, over $3.7

million to Canada, over $1.7 million to Romania, and over $800,000 to Ghana,

which are all high-risk fraud countries.  Although Western Union was aware of

problematic agent locations in Spain, it failed to promptly suspend and terminate

those agent locations.

46.     Prior to 2011, Western Union received a small number of complaints

each year involving its Peruvian agents.  For example, in 2010, Western Union

recorded only 71 fraud reports against agents in Peru totaling $38,492.  In 2011,

however, there was a dramatic spike in complaints about money transfers paid out

in Peru, especially about emergency scams, with Western Union receiving at least

692 complaints totaling $2,218,761.  The average transfer amount in the

complained-of transactions jumped from $542 to $3,206.  In 2012, the numbers

increased to 1,003 fraud complaints totaling $1,944,730.  Over 96% of the

complained-of transfers paid out in Peru in 2011 and 2012 originated from the

United States.  Between 2011 and 2012, thirteen Peruvian agents paid out

$3,603,539 in reported fraud, and together were responsible for nearly 87% of the

total reported fraud payouts in Peru for those years.  Internal reports and records

show that Western Union was aware of the dramatic increase in complaints, as

well as particular Peruvian agent locations that were responsible for paying out

most of the reported fraud.  Despite its awareness, Western Union failed to terminate problematic agent locations until after law enforcement began to inquire and raise concerns about the fraud, and even then, one agent location terminated for consumer fraud was reactivated under a different agent ID.  In recent years, Western Union has continued to receive complaints from U.S. consumers concerning high-dollar emergency scam-related money transfers paid out at agent locations in Peru.

47.    For many years, Nigerian scammers have been at the center of many international frauds.  Although Western Union's agent locations in Nigeria are in banks, those bank locations, too, have paid out large numbers of fraud-induced money transfers and engaged in other suspicious activities.  According to Western Union's records, Nigeria has been the fourth highest payout destination for fraud complaints received by Western Union since 2006.  Since then, Western Union has received complaints about at least 48,047 money transfers paid out in Nigeria, totaling over $38.2 million.  Approximately 86.7% of the complained-of transfers originated from the United States.  During this period, a subset of 68 Western Union agent locations in Nigeria was responsible for at least 17,743 complaints totaling over $16.6 million in reported fraud.  Based on the complaints, reported fraud is typically paid out at various locations of two large banks in Nigeria.  Overall, one of those banks has at least 15,184 complaints totaling $11,292,195,

while the other has at least 10,948 complaints totaling $8,167,769.  Individual

locations of the two banks also have amassed huge numbers of complaints.  One

location alone was responsible for at least 832 complaints totaling $1,407,252,

while another was responsible for at least 1,741 complaints totaling $1,187,141.

Despite repeated reviews and investigations of agent locations in Nigeria, as of

October 2015, Western Union had rarely, if ever, terminated agent locations in

Nigeria for consumer fraud.

48.    Over the years, agent locations in many other countries have appeared

on Western Union's fraud reports, and have been reviewed by the company for

fraud.  Those countries include, but are not limited to, Ghana, the Philippines,

Bolivia, China, Malaysia, the Dominican Republic, Greece, and Thailand.  Some

of those agent locations continue to operate despite having high levels of fraud,

while others have been suspended or terminated, but only after having caused

substantial injury to consumers over many months or, in some cases, years.

### Government Agencies Worldwide Warned
### Western Union about Consumer Fraud Involving Its System

49.    In addition to consumer complaints and Western Union's internal

reports and records, Western Union's awareness of the consumer fraud problem

with its money transfer system is further demonstrated by the fact that law

enforcement agencies in the United States and throughout the world have warned

the company for many years that its money transfer system was being used to

perpetrate consumer frauds, and that Western Union was not adequately addressing the problem.

50.    First, in or around 2002, multiple state Attorneys General issued subpoenas to Western Union in conjunction with their investigations of the use of Western Union's money transfer system by fraudulent telemarketers.  In correspondence dated October 1, 2002, the Vermont Attorney General's Office informed Western Union about disturbing statistics regarding telemarketers in Quebec, Ontario, British Columbia, and Israel misusing Western Union's money transfer system for frauds.

51.    In or around November 2005, Western Union entered into an agreement with forty-seven states and the District of Columbia involving the use of Western Union's money transfer system by "fraudulent telemarketers in and outside the United States" ("2005 Agreement").  The 2005 Agreement imposed a number of requirements upon Western Union, including warnings to consumers, agent training, closure of agents, development of a computerized system to identify likely fraud, and increasing anti-fraud staff.  For example, the 2005 Agreement required that Western Union "terminate those of its agents, subagents or locations, as the case may be, who are complicit in fraud-induced transfers or who knowingly ignore such fraud, or, if certain employees of the agent or subagent are the complicit or knowingly ignoring parties, insist upon termination of such employees

as a condition to continued agent or subagent status." The 2005 Agreement was in effect for five years. Despite this agreement, as explained below, Western Union in many instances failed to terminate many problematic agent locations, especially in countries outside of the United States and Canada.

52.    In October 2009, the FTC announced that it had reached a settlement with MoneyGram International, Inc. ("MoneyGram"), Western Union's main competitor, relating to charges that the company had allowed its money transfer system to be used for fraud. The FTC publicly released copies of the complaint and order against MoneyGram, which required, among other things, the termination of any agent that "may be complicit in" fraud. Following the FTC's settlement with MoneyGram, FTC staff sent a letter to Western Union in November 2009 expressing concern about the "huge volume of fraud that employs money transfer services," like that of Western Union.

53.    According to Western Union's records, in or around September 2010, the Japan Financial Services Agency expressed concerns about Japanese consumers sending fraud-induced money transfers to the UK, and "suspicious viewing/surfing of transactions in the United Kingdom, resulting in either Paid in Error (PIE) or Non Payment Claims [complaints about money transfers being paid to the wrong person or not being paid]."

54.     Since at least June 2011, the Minnesota Attorney General's Office has been warning Western Union in correspondence directed to the attention of the President and Chief Executive Officer that "each year thousands of consumers are defrauded through use of your company's services," and that "[g]iven your firm's apparently continuing inability or unwillingness to detect and prevent such wire transfer fraud, it would seem appropriate to" issue refunds to consumers. This correspondence has routinely described the consumer complaints the Minnesota Attorney General has received from fraud victims. In response, Western Union typically has refused to issue any refunds to the victims after the funds were paid out.

55.     In or around October 2011, multiple state Attorneys General issued subpoenas to Western Union in connection with investigations of fraudulent telemarketers' use of Western Union's money transfer system. The subpoena issued by Vermont stated that it had "reason to believe that Western Union has provided substantial assistance to fraudulent telemarketers in the form of access to its money transfer system, despite knowing, or consciously avoiding knowing, of the fraud, in violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a)."

56.     On or about November 29, 2011, Western Union personnel met with the Korea Financial Supervisory Services to discuss the regulator's concerns about

consumer fraud involving Western Union's money transfer system and its requirement that Western Union put together a plan to alleviate consumer fraud.

57.    In February 2012, in response to a survey sent to law enforcement by Western Union, a Special Agent for the U.S. Secret Service warned Western Union of the following: that its services were "widely used by Nigerian scammers and other criminal elements overseas"; "a person in America can easily be robbed by someone in a foreign country and there is almost no possibility to recover that fraud loss"; its "services are widely used for online scams in the US"; and that Western Union "is a complete and almost total safe haven for the criminal element to freely launder illegal proceeds without detection."

58.    According to Western Union's records, by the first quarter of 2012, the Serious Organised Crime Agency ("SOCA") in the United Kingdom, presently known as the National Crime Agency, disclosed to Western Union that in relation to an "investigation conducted on money remitters in Western England," SOCA had "surveyed Western Union customers and found that 81% of the transactions paid in Nigeria or Ghana were allegedly fraud related."

59.    In or around late May 2012, the Toronto Police Service sent Western Union a letter alerting the company that it "may have aided individuals with the criminal offense of laundering [the] proceeds of crime" from consumer frauds, and cautioning that it needed to take "the appropriate steps . . . to ensure that Western

38

Union is not a party to this serious criminal offense, whether intentionally or willfully blind to its role."  In numerous additional instances, the Toronto Police Service emailed Western Union information about other fraud-induced money transfers and the names of individuals who had collected the transfers, telling the company to consider the emails a formal caution that allowing the individuals to collect future transfers could be considered "aiding the criminal offence of Laundering the Proceeds of Crime."

60.    In or around October 2012, Western Union received a letter from SEPBLAC, Spain's Financial Intelligence Unit and Anti-Money Laundering/Counter Financing of Terrorism Supervisory Authority, informing Western Union that an inspection had revealed "extremely serious facts," which required WUPSIL to "adopt urgent measures in order to correct them immediately," and that the operations of a "significant part of" Western Union's agents in two networks owned by Western Union "are related to fraud and money laundering."

## DESPITE AWARENESS OF THE FRAUD,
## WESTERN UNION HAS CONTINUED TO PROVIDE
## SUBSTANTIAL ASSISTANCE OR SUPPORT TO CONSUMER FRAUDS

61.    Since at least January 2004, and continuing thereafter, Western Union has been aware that perpetrators of frauds have used its money transfer system to obtain funds from their victims, and for many years has knowingly, or with

conscious avoidance of knowledge, provided substantial assistance or support to fraudulent telemarketers and con artists.

62.     In some cases, Western Union's agents, subagents, or FLAs have been complicit, or sometimes even participated, in the frauds.  In other cases, Western Union's agents, subagents, or FLAs have offered substantial assistance or support to the frauds by paying out funds in violation of Western Union's own policies and procedures.

63.     Western Union has provided an essential service to these fraudulent telemarketers, sellers, and con artists by permitting them access to Western Union's money transfer system.  Exploiting this access to its full potential, telemarketing, mass marketing, and imposter scams have received, and continue to receive, millions of dollars from victimized consumers, while generating substantial revenue for Western Union from transaction fees and foreign currency exchange fees.

64.     For many years, Western Union has failed to: (a) promptly investigate, suspend, and terminate potentially complicit agents and subagents, or agents and subagents that have failed to comply with Western Union's anti-fraud and/or AML policies and procedures; (b) conduct adequate due diligence on prospective and existing agents and subagents; (c) effectively train, monitor, and review its agents, subagents, and FLAs; (d) adequately collect, record, and report

consumer fraud involving its money transfer system; and (e) take other reasonable steps to prevent fraudulent telemarketers, sellers, and con artists from using Western Union's money transfer system to perpetrate their frauds.

65.     In numerous instances, Western Union has failed to take timely, appropriate, and effective measures to mitigate fraud in connection with its processing of money transfers sent by consumers despite knowledge, or conscious avoidance of knowledge, that: fraudulent telemarketers, sellers, and con artists have extensively accessed and exploited Western Union's money transfer system; Western Union's money transfer system has played an integral role in the scams; and a number of its agents have been complicit, or involved, in the frauds, or have failed to adhere to Western Union's policies and procedures to detect and prevent fraud.

### Western Union Has Failed to Promptly Investigate, Suspend, and Terminate Agents with High Levels of Consumer Fraud

66.     Despite Western Union's awareness of consumer fraud involving its system, Western Union has in many instances failed to promptly investigate, suspend, and terminate agents and subagents that have exhibited high levels of consumer fraud, some of which were likely complicit in frauds, or which have ignored such frauds by failing to comply with Western Union's policies and procedures, thereby causing significant and ongoing harm to consumers.

67.     Even though Western Union's internal reports have identified agent locations where 5% to over 75% of the transactions (in volume or amount) constituted confirmed and potential fraud, and/or suspicious activities, such as surfing, flipping, and data integrity issues, Western Union has allowed many of these agents and subagents to continue operating, with only temporary suspensions, if any.  In many cases, Western Union has simply "escalated," or referred, such agents for further review or investigation, but the investigations often have been delayed for months, and in many instances, the escalations have failed to resolve the problems.  Western Union frequently has relied on its master agents to conduct their own investigations of their subagents and locations, but has failed to ensure that the master agents' investigations are adequate.  Western Union also has sometimes repeatedly escalated the same agents for review or investigation without suspending or eventually terminating those agents even while the agent has continued to be the subject of fraud complaints.  Western Union has sometimes even disregarded recommendations from its employees to suspend or terminate certain agents or subagents due to serious consumer fraud problems.

68.     Western Union has permitted agents and subagents that have processed hundreds of thousands of dollars, or even millions of dollars, in confirmed and potential fraud to continue operating for months or even years despite highly suspicious activities and indications of complicity.  For example,

one agent location in Spain, Locutorio Okuns, operated from 2005 until at least 2012. During that time, the agent engaged in highly suspicious activity, including making payouts related to 126 complaints totaling at least $341,771 in reported fraud, and receiving over $1 million from the United States in money transfers that had characteristics indicative of fraud, such as unusually high-dollar amounts and serious data integrity issues. The agent also displayed highly suspicious spikes in volume that corresponded with spikes in fraud complaints. Although it was reviewed by Western Union at least five times, the agent was permitted to continue to operate for years, and its owner was ultimately one of the individuals arrested by the Spanish police in 2014, as described above. Another agent location in the UK, S S Newsagent, made payouts relating to at least 347 complaints totaling $924,695 in reported fraud between 2005 and 2012. That agent received over $2.7 million in money transfers from the United States, including over $1 million in 2007 alone, and the majority of those transactions had characteristics indicative of fraud, including unusually high-dollar amounts and data integrity issues. Even though the agent was reviewed multiple times, it was not terminated despite its history as a high-fraud agent.

69.     Even in instances where Western Union has suspended high-fraud agents after a few months rather than years, the agents often have generated significant consumer losses that Western Union could have prevented by acting

43

more quickly.  These agents frequently are immediately identifiable based on spikes in fraud complaints during the first problematic month.  For example, during a 30-day period beginning in December 2011, Western Union received 54 complaints, totaling $246,746, concerning money transfers paid out at one agent location in Bolivia.  This location had a Nigerian owner and had already been reviewed by Western Union in the past due to suspicious activity involving millions of dollars in payouts from China.  Western Union failed to promptly suspend the agent and during a roughly four-month period from December 2011 to April 2012, it was responsible for paying out at least 191 transfers associated with fraud complaints totaling $825,319.  The average reported fraud transfer was $4,321, and all of the complaints involved U.S. senders who were the victims of emergency scams.  Although this agent was suspended in July 2012, it had paid out over $2.5 million in suspected fraud in just over four months before Western Union took action.

70.    In instances where Western Union suspended agents or subagents due to consumer fraud, the suspensions often were only temporary, even in high-risk fraud countries, such as Nigeria, Ghana, and Jamaica.  For example, in or around 2012, Western Union identified and suspended 13 agent locations in Montego Bay, Jamaica, that had been processing millions of dollars of fraudulent and potentially fraudulent money transfers related to lottery/sweepstakes fraud.  The suspensions

44

only lasted a short time, however, before the agents were reactivated.  After being reactivated, ten of those agents have continued to pay out tens to hundreds of reported fraud complaints each year since 2013, and in that span have been the subject of 2,055 complaints totaling $737,319.

71.    In some instances, reactivated agents or subagents were assigned new agent ID numbers or became subagents in different agent networks.  For example, Western Union's top fraud payout agent in Mexico made payouts relating to at least 410 complaints totaling over $1.4 million in reported fraud between March 2011 and July 2012.  Western Union finally suspended the location in July 2012, but one month later, the same agent began to operate again under a new agent ID, and it continued generating fraud complaints.  In addition, Western Union even reactivated some agents that had been terminated due to consumer fraud.

72.    Western Union's general practice has been to attempt to rehabilitate agents and subagents exhibiting high levels of consumer fraud by requiring its agents to implement "action plans" to address the problems, but this practice has been inadequate and ineffective.  In many instances, Western Union or its agents have failed to create action plans that effectively address consumer fraud.  The action plans also often do not adequately and effectively address problems with agents, subagents, and FLAs who are potentially complicit and/or have engaged in suspicious activities.  For example, the action plans frequently call for the training

of agent locations and FLAs even though Western Union has acknowledged that "identifying and eliminating complicit actors from the system is more effective at combating consumer fraud than training."  In other instances, Western Union or its agents have failed to create any action plan or for months have delayed creating action plans.  Even after action plans have been created, in some cases, the agents and subagents have resisted implementing them, failed to do so satisfactorily, or even ignored them.

73.    For many years, suspensions and/or terminations were typically limited to agents in the United States and Canada.  For example, between January 1, 2006 and November 1, 2010, Western Union failed to terminate many problematic agent locations worldwide that had paid out $100,000 or more in reported fraud, including in the UK (124 agents), Nigeria (56 agents), Ghana (18 agents), Jamaica and Spain (16 agents each).  In fact, two UK agents each were responsible for paying out over $2 million in reported fraud between January 1, 2006 and November 1, 2010.  Moreover, as of October 2015, Western Union had rarely, if ever, terminated agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at agent locations.

**Western Union Has Failed to Conduct Adequate Due Diligence on Agents**

74.     For many years, Western Union has failed to conduct adequate due diligence on its prospective agents and subagents, as well as those agents and subagents whose contracts come up for renewal.  Western Union either has not conducted background checks on many of its agents and subagents, or to the extent background checks have been conducted, they often have been inadequate.  It also has, in many instances, failed to maintain records demonstrating that it has conducted such background checks.  In addition, despite awareness of problems with FLAs, Western Union does not conduct any due diligence on, and frequently knows little about, its agents' and subagents' FLAs.

75.     For many years, Western Union has failed to conduct routine background checks of each of its prospective and existing agents and subagents located around the world.  Even though Western Union's agreements provide it with the authority to conduct background checks on its agents or subagents at any time, Western Union's practice in many countries has been to rely on its agents to conduct due diligence on their own subagents and FLAs, rather than conduct its own background checks, including of subagents operating in high-risk fraud countries.  In some instances, Western Union has approved agents or allowed existing agents to continue operating without even knowing the identities of all individuals with ownership, or beneficial ownership, interests in the agent.  In

other instances, Western Union has not known, and has not required its agents to disclose or update, the identities of all of its subagents or FLAs.

76.     In numerous instances, background checks conducted by Western Union have not been thorough, consisting only of collecting limited information and conducting some type of credit or financial check, rather than criminal background checks of its agents and subagents.  In many cases, Western Union has relied upon inaccurate, incomplete, or false information provided by agents and has failed to verify the accuracy of information provided by applicants.  Western Union also has installed agents or subagents with criminal histories, including felonies and misdemeanors involving dishonesty, as well as histories of investigations and lawsuits involving allegations of fraud.  For many years, the department at Western Union primarily responsible for conducting background checks has not been provided with sufficient information to conduct thorough background checks of every prospective and existing agent and subagent, such as information from law enforcement, information about investigations of agent locations, and access to consumer complaints.

77.     In some cases, Western Union has installed agents or subagents that it had previously terminated, that were previously suspended or terminated by MoneyGram for fraud, or that were concurrently operating as MoneyGram agents (in violation of Western Union's agent agreements).  One Western Union agent in

College Park, Georgia, for example, was suspended in 2006 due to consumer fraud, but began operating again in 2007 from the same address, but with a different business name and agent ID number, until it was suspended for fraud again. The agent then became a MoneyGram agent and continued to generate fraud-induced money transfers for approximately one year before being terminated by MoneyGram. After that, the agent returned to Western Union in 2009, and began operating for a third time with the same name and at the same location. A review in 2012 revealed that approximately 80% of its payouts were attributable to fraud, and it was later terminated. In 2015, the agent began operating again as a Western Union agent from the same address, using a similar name, but with a new agent ID number, and once again, it began generating fraud complaints.

78.     Western Union's background checks also have failed to prevent previously terminated agents or subagents from using straw men to become agents or owners again to gain access to Western Union's money transfer system. In addition, Western Union has installed as agents or subagents individuals who had previously been interdicted (*i.e.*, blocked from using Western Union's money transfer system) due to suspicious activities, or were former FLAs at agent locations that were suspended or terminated for fraud. For example, after suspending an agent location in the Philippines due to high levels of fraud, Western Union discovered that the owner of the location had been a high-volume

sender to Nigeria who Western Union had interdicted just two months before the location began operating.  During the three-month period before the agent location was suspended, it generated at least 173 fraud complaints totaling $316,400, and paid out over $1.2 million in suspected fraud.

**Western Union Has Failed to Effectively Train, Monitor, and Review Agents**

79.    For many years, Western Union has failed to effectively train, monitor, and review its agents, subagents, and FLAs to detect and prevent consumer fraud and to prevent potential complicity at agent locations.

80.    For many years, Western Union has provided only limited training to agents and subagents with respect to detecting and preventing consumer fraud, and its training overall has been inadequate and ineffective.  In many instances, FLAs responsible for processing fraud-induced money transfers at Western Union's agent locations have not been knowledgeable about Western Union's anti-fraud and/or AML policies and procedures, including with respect to detecting and preventing fraud, properly recording customers' biographical information and IDs, and addressing suspicious activities.  Western Union also has not had an adequate and effective system in place to ensure that FLAs are knowledgeable in these areas.  As a result, in many instances, Western Union's high-fraud agent locations have violated the company's policies and procedures by failing to collect proper IDs or biographical information from recipients of money transfers, accepting

improper forms of IDs, or recording obviously incorrect or fictitious ID information into Western Union's system.

81.    Western Union's complaint database shows that its agent locations that have paid out fraud-induced money transfers frequently have permitted fraudsters to pick up money transfers using fake IDs, or without recording IDs or other required information.  For example, in many instances, these agent locations have recorded the same IDs for multiple recipients, or different IDs for the same recipients.  In addition, for tens of thousands of fraud-induced money transfers, Western Union's records frequently show no birthdates, or facially invalid birthdates, such as "1/1/1900," for the recipients.  Western Union's records also show that its agent locations have paid out at least 32,764 money transfers of $1,000 or more that consumers reported as fraudulent from 2004 through August 2015 without recording any ID information for the recipients.

82.    In addition, despite Western Union's 2005 Agreement with the States, which required Western Union to "commence a program of person-to-person or telephone training at agent locations known to have a materially elevated level of outgoing or incoming fraud-induced transfers sent from the United States to anywhere except Mexico," in many cases, and especially with respect to foreign agents and subagents, Western Union failed to comply with this requirement.  For example, with respect to many of its foreign agent locations that have exhibited

51

high fraud levels, Western Union's practice was only to train the master agents and not to conduct person-to-person or telephone training at the agent locations that exhibited high levels of fraud.

83.    For many years, Western Union has failed to adequately monitor its agents' activity for fraud.  In many instances, Western Union employees responsible for monitoring the activities of agent locations have not been provided with sufficient information or resources to adequately monitor Western Union's agents, subagents, and FLAs.  For example, in some instances, Western Union has assigned more than one agent ID number to a single agent or subagent without providing Western Union employees with the means to easily locate all of the agent's or subagent's ID numbers in Western Union's system.  Western Union has similarly failed to provide its employees with the means to easily identify agents or subagents with common ownership.  In addition, in some cases, Western Union's employees have been unable to identify problematic FLAs because FLAs have not used unique IDs when processing money transfers.  Western Union's employees also sometimes have not had complete and historical information about particular agents and subagents, including information about all fraud complaints, prior reviews, investigations, and internal reports related to fraud, as well as transactional activity.  Therefore, Western Union employees responsible for monitoring agent activity may not have been aware of all relevant information.

84.     Western Union has failed to conduct adequate and routine onsite compliance reviews of its agent locations worldwide.  Western Union often has relied on its master agents to conduct reviews, but has failed to ensure that those master agents are conducting adequate and effective oversight of their subagents and locations.  In some cases, those agents have not even allowed Western Union employees to visit locations without them being present.  In other cases, Western Union's employees have not been able to conduct independent onsite reviews of certain locations because they were in areas considered too dangerous to visit.  Western Union also has failed to conduct adequate and routine onsite reviews of many of its independent agents.

85.     For many years, consumer fraud was not even routinely addressed in compliance reviews of agents.  Even after it was added to the list of topics for these reviews, consumer fraud for many years was addressed only in a cursory manner.  In addition, in many instances, Western Union employees who conduct compliance reviews have not been provided with information about fraud complaints received involving the agents being reviewed, so the employees could not adequately address issues related to the complaints in their reviews.

## Western Union Has Failed to Adequately Collect, Record, and Report Consumer Fraud Involving Its Money Transfer System

86.     Since at least January 2004, Western Union has maintained a complaint database, which contains information relating to complaints or reports the company receives about fraud-induced money transfers.

87.     The information contained in Western Union's complaint database significantly understates the number of actual fraud-induced money transfers and losses reported to the company.  Despite receiving information from consumers, their family members, or law enforcement representatives about fraud-induced money transfers, Western Union often has failed to record information about all of those money transfers in its complaint database.  In other instances, Western Union has failed to record in its database any of the victims' fraud-induced money transfers.

88.     Up until in or around December 2011, Western Union did not provide any toll-free number that consumers in countries other than the United States and Canada could use to report fraud and to try to stop the payout of a fraud-induced money transfer.  For example, Western Union did not provide fraud hotlines for consumers in Germany, Mexico, Spain, and the UK until December 2011, for consumers in Australia, Japan, and Malaysia until February 2012, and for consumers in Austria, Belgium, Luxembourg, and Switzerland until August 2012.

89.     Western Union uses the information in its complaint database to administer its anti-fraud program, so it is important that the database be accurate and complete.  For example, Western Union uses this information to: (a) monitor and identify agents, subagents, and FLAs that may be complicit in frauds; (b) create automated rules regarding particular corridors (*e.g.*, limiting the number and amount of money transfers to receivers); and (c) interdict individuals who are the victims or the perpetrators of frauds.  Therefore, Western Union's failure to keep accurate and complete records of fraud-induced money transfers has impeded its efforts to detect and prevent consumer fraud.

90.     Although Western Union employees have brought the underreporting of fraud-induced money transfers in the company's complaint database to the attention of those responsible for maintaining the database, Western Union has failed to take adequate corrective action, if any, to address the problem.

91.     Although the Financial Crime Enforcement Network ("FinCEN"), the primary administrator of the BSA, requires money services businesses like Western Union to file Suspicious Activity Reports ("SARs") relating to fraud, Western Union has, in many cases, failed to file SARS on, and identify as the subject of SARS, particular agent locations in foreign countries that have processed high levels of fraud-induced money transfers sent by U.S. consumers and exhibited other suspicious activities.

**Western Union Has Failed to Take Other Reasonable Measures to Mitigate Fraud in Connection With Its Processing of Money Transfers**

92.     For many years, Western Union has failed to take other reasonable measures to mitigate fraud in connection with its processing of money transfers, ignoring in some instances useful suggestions and recommendations from its employees and representatives of law enforcement agencies.  These types of measures include, but are not limited to, the following: bolstering its ID requirements for sending or receiving money transfers, such as by imposing more robust ID requirements; requiring the collection of additional biographical information; implementing more controls for noncompliant transactions or potentially fraud-induced money transfers, including, but not limited to, transactions with data integrity issues and to high-risk countries; improving the company's handling of, and ability to receive, complaints about fraud worldwide; and improving its interdiction system to be more effective in blocking money transfers associated with consumer fraud, including, but not limited to, by permanently blocking payouts to the recipients of fraud-induced money transfers.

93.     Western Union has made it difficult for employees to take meaningful action to detect and prevent consumer fraud, including by failing to provide employees with sufficient information or resources, including complete records of consumer fraud complaints, as well as information about law enforcement contacts, investigations, and actions.  For many years, departments within Western

Union responsible for handling consumer fraud issues did not routinely share

consumer fraud information with other groups or departments.

94.     Although Western Union relies on its agents to comply with Western

Union's anti-fraud and AML programs, and to oversee the activity of their own

subagents, locations, and FLAs, it often fails to provide its agents with the

information necessary to conduct effective fraud reviews and to detect and prevent

consumer fraud, including the potential complicity of particular agent locations and

FLAs.  For example, Western Union typically does not share with the agents

themselves complaints it has received about fraud-induced money transfers

processed by the agent locations or FLAs.  Therefore, despite being tasked with

overseeing the conduct of their own subagents, locations, and FLAs, Western

Union's agents in many cases are unaware of the nature, details, history, and

volume of complaints involving the agent locations and FLAs.

95.     Western Union and its agents also have failed to provide adequate

and effective warnings to consumers about the fraud occurring through its money

transfer system.  Although Western Union provides some warnings on the first

page of send forms located at some of its agent locations, in many cases, these

warnings are not clear and conspicuous to many consumers.  In addition, Western

Union's agent locations have failed to provide routine verbal warnings to

consumers before they initiated money transfers, even in instances where

consumers' money transfers have displayed obvious signs of fraud, such as high-dollar money transfers by elderly consumers to countries known for fraud. Therefore, consumers often have been unaware of the risks associated with sending money through Western Union's money transfer system.

## WESTERN UNION HAS FOR MANY YEARS FAILED TO MAKE EFFECTIVE CHANGES TO PREVENT FRAUD

96.     Even after January 2011, when Western Union claimed in a written report to have implemented "a comprehensive anti-fraud program" to protect consumers, Western Union still failed to adopt an adequate and effective anti-fraud program.  Although as a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012, the company still failed in certain cases to promptly terminate agents around the world that appeared to be complicit in paying out the fraud-induced money transfers, including numerous agents in Spain that operated between January 2011 and December 2012, and were arrested by the Spanish police in 2014 for their role in laundering large sums of money received from the fraud victims.  As of October 2015, Western Union had rarely, if ever, terminated agent locations for fraud in certain high-risk countries, including, but not limited to, Mexico, Nigeria, Ghana, the Dominican Republic, China, and Haiti, despite high levels of fraud and indications of complicity at agent locations.

97.     In numerous instances, Western Union has permitted agent locations to continue operating for months or years despite high levels of fraud and other suspicious activities.  For example, from July 2009 to as recently as August 2015, an agent location in Malaysia made payouts relating to at least 252 fraud complaints totaling $389,061.  Although the agent appeared on fraud reports and was reviewed for fraud many times between 2010 and 2014, the agent has not been terminated.  In fact, in 2014, company executives approved the reactivation of that agent despite being informed that confirmed and potential fraud, as well as suspicious activity, amounted to approximately 54% of the agent's pay volume. An agent location in Greece made payouts relating to at least 106 fraud complaints totaling $193,696 from July 2013 to October 2014.  From 2012 to 2014, the agent paid out $5.4 million in money transfers, of which approximately $3.7 million were for $1,000 or more.  That agent operated for over two years despite appearing on internal fraud or agent complicity index reports multiple times and being reviewed for fraud at least three times with findings of suspicious activities.  From September 2013 to August 2015, an agent in Thailand paid out money transfers associated with at least 1,197 complaints totaling $425,409, of which 336 complaints totaling $117,290 were paid out in April 2015 alone.  That agent was allowed to continue operating, despite a review in 2013 finding that 63% of the agent's transactions in two months amounted to confirmed fraud and questionable

activity, and a review in 2015 associated with three of its agent ID numbers finding that 25% of its activity in one month, amounting to over $1.2 million, was connected to fraud.

## VIOLATIONS OF THE FTC ACT

98.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair" or "deceptive" acts and practices in or affecting commerce, including acts or practices involving foreign commerce that "cause or are likely to cause reasonably foreseeable injury within the United States" or "involve material conduct occurring within the United States."

99.     Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### *Unfair Acts or Practices*

100.   In numerous instances, in operating its worldwide money transfer system, Defendant has failed to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers through Defendant's system, as described above.

101.   Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

102.   Therefore, Defendant's practices as described in Paragraph 100 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## THE TSR

103.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

104.   Defendant, its agents, or subagents have processed money transfers and provided related services on behalf of persons who are "sellers" or "telemarketers" engaged in "telemarketing," as those terms are defined in Sections 310.2 (dd), (ff), and (gg) of the TSR.

105.   The TSR prohibits telemarketers and sellers from making a false or misleading statement to induce any person to pay for goods or services.  16 C.F.R. § 310.3(a)(4).

106.   The TSR also prohibits telemarketers and sellers from, among other things, requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit.  16 C.F.R. § 310.4(a)(4).

107.   It is a violation of the TSR for any person to provide "substantial assistance or support" to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in any act or practice that violates Sections 310.3(a), (c), or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

108.   On December 14, 2015, the FTC published a notice that it had adopted amendments to the TSR, including a prohibition against using "cash-to-cash" money transfers for outbound and inbound telemarketing transactions.  80 Fed. Reg. 77520 (Dec. 14, 2015).  This prohibition became effective on June 13, 2016.

109.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TSR

## COUNT II

### *Assisting and Facilitating TSR Violations*

110.   In numerous instances, in the course of processing money transfers, Defendant, its agents, or subagents have provided substantial assistance or support to sellers or telemarketers who Defendant or its agents or subagents knew or consciously avoided knowing:

a.   Induced consumers to pay for goods and services through the use of false or misleading statements, including, without limitation, the statement that the consumer has won and will receive a large cash award if the consumer pays a requested fee or fees, in violation of Section 310.3(a)(4) of the TSR, 16 C.F.R. § 310.3(a)(4); and

b.   Requested or received payment of a fee or consideration in advance of consumers obtaining a loan when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan for a person in violation of Section 310.4(a)(4) of the TSR.

111.    Defendant's acts or practices, as described in Paragraph 110 above, constitute deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §310.3(b).

## CONSUMER INJURY

112.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the TSR.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

113.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

114.    WHEREFORE, Plaintiff, the Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 6(b) of the Telemarketing

Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

1.    Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendant;

2.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

3.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:  January 19, 2017          Respectfully Submitted,

                                  DAVID C. SHONKA
                                  Acting General Counsel

                                  KAREN D. DODGE (IL 6204125)
                                  JOANNIE T. WEI (IL 6276144)
                                  ELIZABETH C. SCOTT (IL 6278075)
                                  Attorneys for Plaintiff
                                  Federal Trade Commission
                                  55 West Monroe Street, Suite 1825
                                  Chicago, Illinois 60603
                                  (312) 960-5634 (telephone)
                                  (312) 960-5600 (facsimile)
                                  kdodge@ftc.gov (Dodge)
                                  jwei@ftc.gov (Wei)
                                  escott@ftc.gov (Scott)